850 So.2d 1116 (2003)
Theresa BROWN, Plaintiff-Appellee,
v.
F.L. WILLIAMS and Barbara Williams, Defendant-Appellant.
No. 36,863-CA.
Court of Appeal of Louisiana, Second Circuit.
July 31, 2003.
*1119 Mitchell Hoffman, for Appellant.
Leroy H. Scott, Jr., Shreveport, Leroy H. Scott, III for Appellee.
Before WILLIAMS, STEWART, CARAWAY, PEATROSS and TRAYLOR (Pro Tempore), JJ.
WILLIAMS, Judge.
The defendants, F.L. and Barbara Williams, appeal a judgment in favor of the plaintiff, Theresa Brown. The trial court, finding that the plaintiff's home was destroyed by a fallen tree which had snapped because of its defective condition, awarded plaintiff damages of $50,000 for the value of her home and $25,000 for the loss of its contents. For the following reasons, we affirm.

FACTS
On April 23, 2000, Theresa Brown resided on Abbie Street in Shreveport, next door to F.L. and Barbara Williams. A large oak tree was located on the Williams' *1120 property. During a storm which generated a tornado in the area, the Williams' oak tree snapped at a point approximately four feet above the ground and fell, demolishing Brown's home and destroying its contents.
Another large tree located one block away was uprooted and a church approximately one mile away was destroyed. Within three to five blocks of the Williams' home, the wind damage to other houses included roof shingles and a car port which were torn away. According to the National Weather Service, a category F-1 tornado with winds of 73 to 112 mph had traveled from Cross Lake and passed near the parties' neighborhood toward downtown Shreveport.
Subsequently, the plaintiff, Theresa Brown, filed a petition for damages against the defendants, F.L. and Barbara Williams and their insurers, Certain Underwriters at Lloyds, London and Specialty Risk Associates. At trial, Rick Kilpatrick, an expert in forestry, testified that the defendants' tree was diseased with a condition known as "heart rot" and opined that this condition was the reason the tree could not withstand the storm winds. The defendants' expert arborist, Curtis Lambert, testified that he believed the extremely high winds associated with the storm had caused the tree to fall.
The trial court issued written reasons for judgment finding that the tree trunk would have survived the storm if not for its weakened condition, that this defective condition was the cause of plaintiff's damages and that the defendants should have known of the tree's defective condition in the exercise of reasonable care. The trial court rendered judgment awarding plaintiff damages of $50,000 for the value of her home and $25,000 for the value of its contents. The defendants appeal the judgment.

DISCUSSION
The defendants contend the trial court erred in finding them liable for damage caused by the falling tree. Defendants argue that the heart rot disease did not sufficiently weaken the tree so as to constitute a defect which presented an unreasonable risk of harm.
An individual is responsible for the damage caused by his own act and by things in his custody. LSA-C.C. art. 2317. The owner or custodian of a thing is answerable for damage caused by its defect only upon a showing that he knew or, in the exercise of reasonable care, should have known of the defect which caused the damage, that the damage could have been prevented by the use of reasonable care, and that he failed to exercise such care. LSA-C.C. art. 2317.1. Thus, to recover for damages caused by a defective thing, the plaintiff must prove that the thing was in the defendant's custody, that the thing contained a defect which presented an unreasonable risk of harm to others, that this defective condition caused the damage and that the defendant knew or should have known of the defect. Moody v. Blanchard Place Apts., 34,587 (La.App.2d Cir.6/20/01), 793 So.2d 281.
A court of appeal should not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State Dept. of Transp. & Development, 617 So.2d 880 (La.1993). The task of a reviewing court is to assess whether the fact finder's resolution of conflicting evidence was reasonable in light of the record as a whole. Fowler v. Wal-Mart Stores, Inc., 30,843 (La.App.2d Cir.8/19/98), 716 So.2d 511. Where there is a conflict in the testimony, a trial court's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, *1121 even though the appellate court may feel that its own inferences are as reasonable. Harris v. Carter, 33,951 (La.App.2d Cir.10/4/00), 768 So.2d 827.
In the present case, Rick Kilpatrick, a state forestry agent for 17 years with a master's degree in forest biometrics, was accepted as an expert in forestry, encompassing the assessment of diseased trees. Kilpatrick testified that he first saw the remaining stump of defendants' tree in February 2001 and observed an area of heart rot, which is an infection of the heart wood, or center, of the tree. Kilpatrick explained that the interior of a tree trunk consists of heart wood, the strongest part of the tree, surrounded by sap wood. He estimated that approximately one-fourth to one-third of the tree's center had rotted. Kilpatrick testified that this diseased condition would have significantly weakened the tree. He stated that heart rot often initiates at the place where a large limb breaks off from the tree.
Kilpatrick explained that because oak trees have shallow roots, healthy oaks may be uprooted in very high winds, whereas trees with deeper roots, such as pines, will break apart at the trunk. Kilpatrick opined that if defendants' oak tree had been sound with solid wood throughout, then the tree was very unlikely to have broken in two as a result of the storm winds, indicating that the tree snapped because of the heart rot disease. Kilpatrick testified that in his opinion, if the storm winds had caused the tree to fall, it would have been uprooted and would not have snapped in two, except for its defective condition due to heart rot. Kilpatrick acknowledged that there may or may not be visible external signs that a tree has heart rot. He stated that the presence of green leaves indicates the tree is alive, but not necessarily healthy.
Curtis Lambert, Jr., was accepted as an expert arborist based upon his experience in performing residential tree service work since 1954. Lambert testified that in August 2001, he inspected the oak tree stump on defendants' property and observed heart rot. He stated that the heart wood measured approximately 18 inches across and was surrounded by sap wood 20 inches wide. Lambert testified that heart rot is progressive, so that it continues reducing the heart wood over time, but the sap wood remains unaffected.
Lambert stated that although a tree which loses its heart wood will be weaker than an uninfected tree, the remaining sap wood in defendants' tree would have been sufficient to keep the tree standing in a normal wind. Lambert opined that based on his observations, the heart rot condition did not necessarily make the defendants' tree defective and that the tree would still be standing if not for the extreme winds of the storm. Lambert testified that after examining the stump, he had not seen evidence that heart rot had caused the tree to fall in April 2000. Lambert stated that a broken tree limb in some cases would initiate heart rot, but not if the area healed promptly.
Ernest Ethridge, chief meteorologist at the National Weather Service ("NWS") office in Shreveport for 23 years, was accepted as an expert in meteorology and the assessment of storm-related damage. Ethridge testified that approximately one year after the category F-1 storm of April 23, 2000, he visited several different places along the storm's track looking for evidence of related damage. Ethridge stated that he went to the Allendale area and saw the location where the oak tree had fallen at the corner of Abbie and Norma Streets. He testified that he viewed the stump in defendants' yard and calculated that approximately 19% of the stump had rotted.
*1122 Based on his observations, Ethridge opined that a severe storm with winds of 80 to 90 mph had moved through the neighborhood and that the force exerted by those winds probably caused the defendants' tree to fall.
The defendant, Barbara Williams, testified that she and her husband experienced difficulty driving home after the storm because of debris and tree limbs in the street. Williams stated that a large oak tree located on her premises had snapped and fallen over, destroying plaintiff's home and its contents. Williams testified that other trees and houses in her neighborhood had been damaged, including another large oak tree which had fallen over on the next block. She acknowledged that prior to this incident, defendants had never hired a tree service to trim the tree's branches nor performed any other type of maintenance of their tree, even after a large limb had broken off the tree approximately ten years earlier. Williams testified that the defendants were not aware of the heart rot condition and that the tree did not appear to be in distress, but to the contrary, seemed healthy due to the large amount of green leaves present.
The defendant, F.L. Williams, also testified about the storm damage to other houses and trees in the neighborhood, stating that shingles found in his yard had been blown off a nearby roof. Mr. Williams denied that any of his neighbors had suggested that he cut down the large tree. Mr. Williams testified that he did not see any reason to perform maintenance of the tree because it produced green leaves every year and appeared healthy.
Mattie Harris, a neighbor who lived one house away from defendants, testified that she was at home during the storm in April 2000, when she heard a "roaring noise," became frightened and went into her closet. Harris stated that after the storm passed, she looked outside and saw that her aluminum carport was gone, her roof was damaged and that the defendants' tree had snapped and fallen onto plaintiff's house. Harris testified that a huge tree which was uprooted on Norma Street was the only other tree that fell in her immediate area. Harris stated that she might have made a "casual statement" in a teasing manner to Barbara Williams about cutting down the tree because of its size. Harris testified that she did not see defendants perform any maintenance of their tree, which did not appear to be diseased.
The evidence shows that the oak tree at issue was in the custody of the defendants and was infected with the disease of heart rot. The testimony by Kilpatrick and Lambert demonstrated that the heart rot would weaken the structure of the tree over time through the increased decay of the heart wood, which was a vital part of the tree's stability. Given the size of the tree, its proximity to the plaintiff's home, the gravity of the potential injury and the likelihood of serious harm to persons or property if the tree fell in this residential neighborhood, the trial court could reasonably find that the diseased condition of the tree was a defect which presented an unreasonable risk of harm to others.
In their brief, the defendants contend the plaintiff failed to meet her burden of proving that they knew or should have known of the tree's unreasonably dangerous condition. Defendants argue that they could not have known about the diseased condition of the tree because there were no visible signs of heart rot and the tree appeared healthy.
The Article 2317.1 requirement of actual or constructive knowledge imposes upon the owner or custodian a duty to exercise reasonable care in discovering *1123 ruin, vice or defect. This is a duty to recognize that the thing creates an unreasonable risk of harm to another when applying the degree of attention, perception of the circumstances, memory, intelligence and judgment exercised by a reasonable person. Myers v. Dronet, 01-05 (La.App. 3rd Cir.6/22/01), 801 So.2d 1097.
The defendants acknowledged that during their custody of the tree, a period of more than 25 years, they did not perform any maintenance of the tree whatsoever. They did not take the step of painting over the spot where the limb had broken off ten years earlier and apparently had not even pruned the branches of this large oak tree. Defendants accepted the benefits of the tree, but refused to act to provide minimal care for the tree or to assess the health of the tree, despite the risk of significant harm to their neighbor or themselves if the tree fell due to disease or weather conditions. Based upon the particular circumstances of this case, we cannot say the trial court was clearly wrong in finding that the defendants should have known of the tree's defective condition in the exercise of reasonable care and could have prevented this incident with ordinary maintenance.
Alternatively, defendants argue that they are not liable for the plaintiff's property damage because the tree fell as a result of unusually high winds caused by a force of nature. Once a plaintiff has proven the elements necessary to recover for damage caused by a thing in another's custody, the owner of the thing can avoid liability if he shows that the harm was caused by an Act of God. Greene v. Fox Crossing, Inc., 32,774 (La.App.2d Cir.3/1/00), 754 So.2d 339.
An Act of God, or force majeure, is an unusual, sudden and unexpected manifestation of the forces of nature which man cannot resist. An injury caused by an Act of God is one which is due directly and exclusively to natural causes that could not have been prevented by the exercise of reasonable care. Recovery for injuries caused by extreme weather conditions may be precluded by the application of this rule. Greene v. Fox Crossing, Inc., supra.
In the present case, defendants produced expert testimony by Lambert and Ethridge, who opined that the extremely high winds of the severe storm caused the defendants' tree to fall. In contrast, Kilpatrick opined that the defendants' tree would not have snapped in the storm if it had not been weakened by heart rot disease. Defendants offered testimony describing damage to other trees and buildings throughout the Allendale area as evidence that unusually high winds generated by a tornado had caused their tree to fall. Defendants also showed that another large oak tree on the next block had fallen during the storm.
However, the other fallen oak tree had been uprooted, whereas the defendants' tree had broken in two at a point along its trunk while the roots remained securely in the ground. In addition, smaller trees closer to defendants' tree remained standing. This situation was consistent with Kilpatrick's opinion that a healthy oak tree which was knocked over by storm winds would be uprooted, but that an oak tree which fell because it was weakened by disease would snap apart.
The trial court heard the conflicting expert testimony and weighed the credibility of the witnesses. Considering the evidence presented, we conclude the trial court was not clearly wrong in finding that the defendants failed to establish that the plaintiff's property damage was due directly and exclusively to natural forces which could not have been prevented in the *1124 exercise of reasonable care. Consequently, we cannot say the trial court erred in rejecting the defendants' affirmative defense and in imposing liability upon them for the damage to plaintiff's property. The assignment of error lacks merit.
Damages
The defendants contend the trial court erred in awarding $75,000 for the plaintiff's property damage. Defendants argue that the record does not support the damage award because the plaintiff failed to present evidence of the actual value of her house or its contents on the date of the accident.
When property is damaged through the fault of another, the primary goal is to restore the property, as nearly as possible, to its condition immediately prior to the damage. To determine the amount of damage to property, our courts have followed three approaches: (1) the cost of restoration if the damaged item can be adequately repaired; (2) the difference in value prior to and after the damage; or (3) the cost of replacement, less reasonable depreciation, if the value before and after the damage cannot be reasonably determined. Summarell v. Ross, 27,160 (La. App.2d Cir.8/23/95), 660 So.2d 112; Cenac v. Duplantis, 407 So.2d 424 (La.App. 1st Cir.1981).
The trier of fact is given great discretion in determining damage awards. Before the trial court's damage award may be disturbed, the record must clearly show that the factfinder abused its broad discretion in making the award. Jackson v. A.L. & W Moore Trucking, 609 So.2d 1064 (La. App. 2d Cir.1992). An appellate court's function is not to determine whether a different damage award may have been more appropriate, but whether the trial court's award is based on justifiable inferences from the evidence and is reasonably supported by the record. Summarell v. Ross, supra.
In the present case, Donald Coleman was accepted as an expert in home construction in the Shreveport area. He testified that he was familiar with houses similar to the plaintiff's home in the Allendale area. Coleman opined that the cost to rebuild plaintiff's home would be approximately $60,000 to $70,000. Coleman was not able to estimate the market value of the plaintiff's house prior to the April 2000 accident.
Defendants contend that the trial court should not have made an award for property damage because the plaintiff failed to offer evidence of the actual value of her house and contents at the time of the damage. However, the record shows that the plaintiff's home and contents were damaged beyond repair, so that a fair market value of plaintiff's property could not be assessed at the time of the accident. Consequently, the only reasonable approach remaining to determine the amount of plaintiff's damages was the use of replacement cost less depreciation.
The plaintiff presented expert testimony concerning the cost to rebuild, or replace, her home and the trial court reduced that amount by assessing a depreciation rate of approximately 20%, a percentage which can be calculated from the figures stated by the expert witness. Based upon the evidence in the record, we cannot say the trial court abused its discretion in awarding damages of $50,000 for the loss of plaintiff's home.
With regard to the contents of the home, the trial court accepted the plaintiff's testimony that she owned the household goods listed in Exhibit P-5, which was admitted into evidence. Plaintiff estimated that the purchase price of the contents was approximately $30,000. The list *1125 of contents included, among other items, all household furniture, a stove, refrigerator, washer and dryer, two window-unit air conditioners, a computer with printer, two televisions with VCRs and all clothing, bedding, books and photographs.
In their brief, defendants argue that the record does not support the award for lost contents because the plaintiff did not demonstrate the market value of the goods and failed to present expert testimony regarding the appropriate depreciation factor. However, the cases cited by defendants do not provide authority for their position that expert opinion is required to enable the court to assign a depreciation value. Additionally, as previously stated, the applicable damages standard in this case is replacement cost less depreciation.
In making an award for the lost contents, the trial court weighed the testimony, considered the extensive list of plaintiff's property and applied a depreciation factor. The trial court was able to make reasonable inferences from the evidence presented to determine the replacement cost of the plaintiff's contents and to reasonably depreciate that amount.
After reviewing the record as a whole, we cannot say the trial court's award of $25,000 for the complete loss of plaintiff's household goods, furniture and appliances is beyond the amount reasonably within the factfinder's broad discretion. Thus, we will not disturb the property damage awards. The assignments of error lack merit.
In their brief, defendants contend that Specialty Risk Associates was neither named as a party to this action nor served with a copy of the petition, and thus should not have been cast in judgment. Although this contention was not assigned as error, we note that contrary to defendants' assertion, their motion for an extension of time to file an answer expressly names Specialty Risk Associates as one of the defendants who "suggest to the Court that they were recently served with a copy of the Amended Petition for Damages...."
Generally, an objection to the sufficiency of service of process is raised by the filing of a declinatory exception and all objections which may be raised are waived unless pleaded therein. LSA-C.C.P. art. 925(C). Where a judgment has been entered against a defendant, the question of sufficiency of service of process may not be raised for the first time on appeal. Rather, the issue should be raised in a suit to annul the judgment. Sharff v. Tanner, 486 So.2d 1047 (La.App. 2d Cir.1986); Decca Leasing Corp. v. Torres, 465 So.2d 910 (La.App. 2d Cir.1985). The defendants' argument is without merit.

CONCLUSION
For the foregoing reasons, the trial court's judgment is affirmed. Costs of this appeal are assessed to the appellants, F.L. and Barbara Williams, Certain Underwriters at Lloyds, London and Specialty Risk Associates.
AFFIRMED.
CARAWAY, J., concurs with written reasons.
TRAYLOR, Judge Pro Tempore dissents with written reasons.
PEATROSS, J., dissents for the reasons assigned by TRAYLOR, J.
CARAWAY, J., concurring.
Since I would not interpret La. C.C. art. 2317.1 as broadly as the majority, and because of the strength of the storm in question, I respectfully concur in the ruling to express the following reasons for affirmance.
*1126 The phrase in newly enacted Article 2317.1 on which I would focus is certainly not new to our law of negligence. It asks whether "the damage could have been prevented by the exercise of reasonable care" by the custodian/owner of this 100-year-old oak tree. That question could have been asked in Loescher v. Parr, 324 So.2d 441 (La.1975), about the healthy looking sixty-foot magnolia which fell across the property line upon the neighbor's Cadillac. Yet, under the circumstances of that case, we may assume that the court determined that the duty of reasonable care was not breached with regard to the old defective tree in that neighborhood. Instead, the court rendered its historic ruling which interpreted Article 2317 and became the genesis for Louisiana's strict liability law for "things" in one's custody. After the passage of Act Number One of 1996, new Article 2317.1 was intended to end the strict liability developed after Loescher and allow only the negligence standard to govern. McCoy v. Lucius, 36,894 (La. App.2d Cir.3/5/03), 839 So.2d 1050; Myers v. Dronet, 2001-5 (La.App. 3d Cir.6/22/01), 801 So.2d 1097. In view of this change in the law, if the tree in Loescher did not give rise to negligence, why did the owners of this old oak fail to exercise reasonable care?
The first factor in this case that leads me to an affirmance of the trial court's conclusion of negligence is the gravity of the risk of loss of this huge tree in this particular neighborhood. This area of Shreveport is a very old inner city neighborhood. The evidence reveals that there were at least five frame homes on small narrow lots literally in the shadow of this "humongous" tree, as described by Mrs. Williams. Ms. Brown's home was a narrow wooden structure at 1941 Abbie Street that extended from the front of the street all the way back near an alleyway. The Williams' home next door at 1947 Abbie was not as long, providing a backyard containing the oak which was five feet in diameter at its base. Although the oak was actually on the side of the defendants' yard furthest from the plaintiff's house, it fell toward the house, splitting it virtually down the middle. The angle of the fallen tree was not directly perpendicular to the plaintiff's house but slightly toward Abbie Street causing the front of the house to crash into a large pecan tree in her front yard doing significant damage to the tree. The far side of plaintiff's home was pushed across her fence coming to rest within a few feet of Calvin Hamilton's house next door. Therefore, if the tree had fallen perpendicular into plaintiff's house, it would have not only split her house but would have caused further damage to Hamilton's house.
The large branches of the oak clearly extended over the defendants' property line on the opposite side of their backyard away from the plaintiff. Two houses down at 1955 Abbie lived Ms. Harris. She testified that she remembered politely suggesting to Mrs. Williams that they should remove the tree. Harris raked leaves in her yard from the tree every year, but her testimony suggested that she had concerns about the huge tree which, if it fell her way, could have also damaged her property and home, and the lot and home in between.
The second factor which apparently did not exist in Loescher is the fact that this oak, prior to its fall, already posed a significant risk by the encroachment of its branches upon neighboring property. (See, opinion of lower court, Loescher v. Parr, 312 So.2d 347 (La.App. 1st Cir.1975), rejecting the application of the sic utere doctrine under La. C.C. art. 667 without mention of the more specific legal servitude for encroachment of the tree branches under Article 691 of the Civil Code of *1127 1870.) An obligation of vicinage or good neighborhood is thus involved in this case. Generally, such obligation is seen in La. C.C. arts. 667-669 which have been the subject of much commentary and jurisprudence. However, the more specific legal servitude regulating the neighborhood relations for tree branches is found in La. C.C. art. 688, which provides as follows:
A landowner has the right to demand that the branches or roots of a neighbor's trees, bushes, or plants, that extend over or into his property be trimmed at the expense of the neighbor.
A landowner does not have this right if the roots or branches do not interfere with the enjoyment of his property.
This article revised former Civil Code article 691 and has been interpreted to require the owner of the tree to pay the costs for property damages and nuisance expenses related to fallen leaves and branches from the tree. Scott v. Ramos, 399 So.2d 1266 (La.App. 4th Cir.1981), writ denied, 404 So.2d 279 (La.1981); see also, Gibbs v. Tourres, 50 So.2d 652 (La.App. 2d Cir. 1951) (where the encroachment of the tree branches upon the adjacent lot was apparently a factor in the determination of negligence for the damages caused by the tree).
With the association under Article 2317.1 between a defendant's constructive awareness of a defect and his general duty of reasonable care, it is important in this case that the legislature, with Article 688, had already imposed upon these defendants a duty with regard to this tree prior to its demise. Once the tree's branches encroached upon a neighboring tract, the defendants were charged with the knowledge that the tree's debris might cause damage or otherwise interfere with the enjoyment of the neighboring tract for which they would be responsible. Because of the foreseeable risk for the falling of large branches upon the neighboring tract and the existing duty under Article 688, the trial court could conclude in this case that "in the exercise of reasonable care" the Williams should have learned of the greater danger posed by the tree's hidden defect prior to this storm.
Finally, the strength of the tornadic storm in question admittedly was shown by the evidence to be as great or greater than the storm addressed by the court in Rector v. Hartford Accident & Indem. Co., 120 So.2d 511 (La.App. 1st Cir.1960). After a thorough review of definitions of act of God employed in this state and elsewhere, Rector concluded that the downing of the tree in that case was an act of God, reversing the lower court's finding of negligence. In the opinion the court quoted a concise rule from the Corpus Juris that "an act which may be prevented by the exercise of ordinary care is not an act of God." Id. at 515. The court also cited the case of Southern Air Transport v. Gulf Airways, 215 La. 366, 40 So.2d 787 (1949), where our supreme court expressed a similar definition finding the defendant negligent despite an extreme wind storm.
With regard to a large old tree, the defense in question must be seen as overblown. The forces of nature are always acting upon such tree, weakening its endurance. Thus, the duty to guard against large branches falling upon the neighboring tract reflected in Article 688 has within the scope of its protection strong winds of various forces. At what velocity such winds become an act of God is a question which I will humbly avoid in this case in view of the defendants' failure in performance of their duty before the storm.
TRAYLOR, Judge Pro Tempore, dissenting.

I respectfully dissent. The owner or custodian of a thing is no longer strictly liable without proof of fault. La. C.C. art. *1128 2317.1. Plaintiff failed to prove that defendants knew or should have known that there was any defect in their tree or that defendants should have suspected unnoticeable heart rot. There is no duty on a homeowner to become a professional arborist in order to diagnose his apparently healthy but ailing water oak of non-apparent conditions. Caples v. USAA Ins. Co., 2000-2513 (La.App. 1st Cir.12/28/01), 806 So.2d 148, writ denied, XXXX-XXXX (La.04/12/02) 813 So.2d 405. The evidence did show that regardless of heart rot, this tree would still be standing were it not for the category F-1 tornado. As was said in Rector v. Hartford Acc. & Indem. Co. of Hartford, Conn., 120 So.2d 511 (La.App. 1st Cir.1960): "The only way that these defendants could have avoided the effect of this act of God would have been to have had reason to have removed this tree prior to the date of the storm." Fault should not be proven by hindsight. This is an unwarranted return to strict liability.